*248 Justice Kennedy
delivered the opinion of the Court.
The question before us is whether the Controlled Substances Act allows the United States Attorney General to *249 prohibit doctors from prescribing regulated drugs for use in physician-assisted suicide, notwithstanding a state law permitting the procedure. As the Court has observed, “Americans are engaged in an earnest and profound debate about the morality, legality, and practicality of physician-assisted suicide.” Washington v. Glucksberg, 521 U. S. 702, 735 (1997). The dispute before us is in part a product of this political and moral debate, but its resolution requires an inquiry familiar to the courts: interpreting a federal statute to determine whether executive action is authorized by, or otherwise consistent with, the enactment.
In 1994, Oregon became the first State to legalize assisted suicide when voters approved a ballot measure enacting the Oregon Death With Dignity Act (ODWDA). Ore. Rev. Stat. § 127.800 et seq. (2003). ODWDA, which survived a 1997 ballot measure seeking its repeal, exempts from civil or criminal liability state-licensed physicians who, in compliance with the specific safeguards in ODWDA, dispense or prescribe a lethal dose of drugs upon the request of a terminally' ill patient.
The drugs Oregon physicians prescribe under ODWDA are regulated under a federal statute, the Controlled Substances Act (CSA or Act). 84 Stat. 1242, as amended, 21 U. S. C. §801 et seq. The CSA allows these particular drugs to be available only by a written prescription from a registered physician. In the ordinary course the same drugs are prescribed in smaller doses for pain alleviation.
A November 9, 2001, Interpretive Rule issued by the Attorney General «addresses the implementation and enforcement of the CSA with respect to ODWDA. It determines that using controlled substances to assist suicide is not a legitimate medical practice and that dispensing or prescribing them for this purpose is unlawful under the CSA. The Interpretive Rule’s validity under the CSA is the issue before us.
*250 I
A
We turn first to the text and structure of the CSA. Enacted in 1970 with the main objectives of combating drug abusé and controlling the legitimate and illegitimate traffic in controlled substances, the CSA creates a comprehensive, closed regulatory regime criminalizing the unauthorized manufacture, distribution, dispensing, and possession of substances classified in any of the Act’s five schedules. Gonzales v. Raich, 545 U. S. 1, 12-13 (2005); 21 U. S. C. §841 (2000 ed. and Supp. II); 21 U. S. C. §844. The Act places substances in one of five schedules based on their potential for abuse or dependence, their accepted medical use, and their accepted safety for use under medical supervision. Schedule I contains the most severe restrictions on access and use, and Schedule V the least. Raich, supra, at 14; 21 U. S. C. §812. Congress classified a host of substances when it enacted the CSA, but the statute permits the Attorney General to add, remove, or reschedule substances. He may do so, however, only after making particular findings, and on scientific and medical matters he is required to accept the findings of the Secretary of Health and Human Services (Secretary). These proceedings must be on the record after an opportunity for comment. See 21U. S. C. § 811 (2000 ed. and Supp. V).
The present dispute involves controlled substances listed in Schedule II, substances generally available only pursuant to a written, nonrefillable prescription by a physician. 21 U. S. C. § 829(a). A 1971 regulation promulgated by the Attorney General requires that every prescription for a controlled substance “be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.” 21 CFR § 1306.04(a) (2005).
To prevent diversion of controlled substances with medical uses, the CSA regulates the activity of physicians. To issue *251 lawful prescriptions of Schedule II drugs, physicians must “obtain from the Attorney General a registration issued in accordance with the rules and regulations promulgated by him.” 21 U. S. C. § 822(a)(2). The Attorney General may deny, suspend, or revoke this registration if, as relevant here, the physician’s registration would be “inconsistent with the public interest.” § 824(a)(4); § 822(a)(2). When deciding whether a practitioner’s registration is in the public interest, the Attorney General “shall” consider:
“(1) The recommendation of the appropriate State licensing board or professional disciplinary authority.
“(2) The applicant’s experience in dispensing, or conducting research with respect to controlled substances.
“(3) The applicant’s conviction record under Federal or State laws relating to the manufacture, distribution, or dispensing of controlled substances.
“(4) Compliance with applicable State, Federal, or local laws relating to controlled substances.
“(5) Such other conduct which may threaten the public health and safety.” § 823(f).
The CSA explicitly contemplates a role for the States in regulating controlled substances, as evidenced by its preemption provision.
“No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates ... to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision ... and that State law so that the two cannot consistently stand together.” §903.
B
Oregon voters enacted ODWDA in 1994. For Oregon residents to be eligible to request a prescription under *252 ODWDA, they must receive a diagnosis from their attending physician that they have an incurable and irreversible disease that, within reasonable medical judgment, will cause death within six months. Ore. Rev. Stat. §§127.815, 127.800(12) (2008). Attending physicians must also determine whether a patient has made a voluntary request, ensure a patient’s choice is informed, and refer patients to counseling if they might be suffering from a psychological disorder or depression causing impaired judgment. §§ 127.815, 127.825. A second “consulting” physician must examine the patient and the medical record and confirm the attending physician’s conclusions. § 127.800(8). Oregon physicians may dispense or issue a prescription for the requested drug, but may not administer it. §§ 127.815(1)(L), 127.880.
The reviewing physicians must keep detailed medical records of the process leading to the final prescription, § 127.855, records that Oregon’s Department of Human Services reviews, §127.865. Physicians who dispense medication pursuant to ODWDA must also be registered with both the State’s Board of Medical Examiners and the federal Drug Enforcement Administration (DEA). § 127.815(1)(L). In 2004, 37 patients ended their lives by ingesting a lethal dose of medication prescribed under ODWDA. Oregon Dept, of Human Servs., Seventh Annual Report on Oregon’s Death with Dignity Act 20 (Mar. 10, 2005).
C
In 1997, Members of Congress concerned about ODWDA invited the DEA to prosecute or revoke the CSA registration of Oregon physicians who assist suicide. They contended that hastening a patient’s death is not legitimate medical practice, so prescribing controlled substances for that purpose violates the CSA. Letter from Sen. Orrin Hatch and Rep. Henry Hyde to Thomas A. Constantine (July 25, 1997), reprinted in Hearing on S. 2151 before the Senate Committee on the Judiciary, 105th Cong., 2d Sess., 2-3 (1999) *253 (hereinafter Hearing). The letter received an initial, favorable response from the director of the DEA, see Letter from Thomas A. Constantine to Sen. Orrin Hatch (Nov. 5, 1997), Hearing 4-5, but Attorney General Reno considered the matter and concluded that the DEA could not take the proposed action because the CSA did not authorize it to “displace the states as the primary regulators of the medical profession, or to override a state’s determination’ as to what constitutes legitimate medical practice,” Letter from Attorney General Janet Reno to Sen. Orrin Hatch, on Oregon’s Death with Dignity Act (June 5,1998), Hearing 5-6. Legislation was then introduced to grant the explicit authority Attorney General Reno found lacking; but it failed to pass. See H. R. 4006,105th Cong., 2d Sess. (1998); H. R. 2260, 106th Cong., 1st Sess. (1999).
In 2001, John Ashcroft was appointed Attorney General. Perhaps because Mr. Ashcroft had supported efforts to curtail assisted suicide while serving as a Senator, see, e. g., 143 Cong. Rec. 5589-5590 (1997) (remarks of Sen. Ashcroft), Oregon Attorney General Hardy Myers wrote him to request a meeting with Department of Justice officials should the Department decide to revisit the application of the CSA to assisted suicide. Letter of Feb. 2, 2001, App. to Brief for Patient-Respondents in Opposition 55a. Attorney General Myers received a reply letter from one of Attorney General Ashcroft’s advisers writing on his behalf, which stated:
“I am aware of no pending legislation in Congress that would prompt a review of the Department’s interpretation of the CSA as it relates to physician-assisted suicide. Should such a review be commenced in the future, we would be happy to include your views in that review.” Letter from Lori Sharpe (Apr. 17, 2001), id., at 58a.
On November 9,2001, without consulting Oregon or apparently anyone outside his Department, the Attorney General *254 issued an Interpretive Rule announcing his intent to restrict the use of controlled substances for physician-assisted suicide. Incorporating the legal analysis of a memorandum he had solicited from his Office of Legal Counsel, the Attorney General ruled:
“[Assisting suicide is not a ‘legitimate medical purpose’ within the meaning of 21 CFR 1306.04 (2001), and that prescribing, dispensing, or administering federally controlled substances to assist suicide violates the Controlled Substances Act. Such conduct by a physician registered to dispense controlled substances may ‘render his registration .. . inconsistent with the public interest’ and therefore subject to possible suspension or revocation under 21 U. S. C. 824(a)(4). The Attorney General’s conclusion applies regardless of whether state law authorizes or permits such conduct by practitioners or others and regardless of the condition of the person whose suicide is assisted.” 66 Fed. Reg. 56608 (2001).
There is little dispute that the Interpretive Rule would substantially disrupt the ODWDA regime. Respondents contend, and petitioners do not dispute, that every prescription filled under ODWDA has specified drugs classified under Schedule II. A physician cannot prescribe the substances without DEA registration, and revocation or suspension of the registration would be a severe restriction on medical practice. Dispensing controlled substances without a valid prescription, furthermore, is a federal crime. See, e. g., 21 U. S. C. § 841(a)(1); United States v. Moore, 423 U. S. 122 (1975).
In response the State of Oregon, joined by a physician, a pharmacist, and some terminally ill patients, all from Oregon, challenged the Interpretive Rule in federal court. The United States District Court for the District of Oregon entered a permanent injunction against the Interpretive Rule’s enforcement.
*255 A divided panel of the Court of Appeals for the Ninth Circuit granted the petitions for review and held the Interpretive Rule invalid. Oregon v. Ashcroft, 368 F. 3d 1118 (2004). It reasoned that, by making a medical procedure authorized under Oregon law a federal offense, the Interpretive Rule altered the “‘“usual constitutional balance between the States and the Federal Government” ’ ” without the requisite clear statement that the CSA authorized such action. Id., at 1124-1125 (quoting Gregory v. Ashcroft, 501 U. S. 452, 460 (1991), in turn quoting Atascadero State Hospital v. Scanlon, 473 U. S. 234, 242 (1985)). The Court of Appeals held in the alternative that the Interpretive Rule could not be squared with the plain language of the CSA, which targets only conventional drug abuse and excludes the Attorney General from decisions on medical policy. 368 F. 3d, at 1125-1129.
We granted the Government’s petition for certiorari. 543 U. S: 1145 (2005).
II
Executive actors often must interpret the enactments Congress has charged them with enforcing and implementing. The parties before us are in sharp disagreement both as to the degree of deference we must accord the Interpretive Rule’s substantive conclusions and whether the Rule is authorized by the statutory text at all. Although balancing the necessary respect for an agency’s knowledge, expertise, and constitutional office with the courts’ role as interpreter of laws can be a delicate matter, familiar principles guide us. An administrative rule may receive substantial deference if it interprets the issuing agency’s own ambiguous regulation. Auer v. Robbins, 519 U. S. 452, 461-463 (1997). An interpretation of an ambiguous statute may also receive substantial deference. Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837, 842-845 (1984). Deference in accordance with Chevron, however, is warranted only “when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, *256 and that the agency interpretation claiming deference was promulgated in the exercise of that authority.” United States v. Mead Corp., 533 U. S. 218, 226-227 (2001). Otherwise, the interpretation is “entitled to respect” only to the extent it has the “power to persuade.” Skidmore v. Swift & Co., 323 U. S. 134, 140 (1944).
A
The Government first argues that the Interpretive Rule is an elaboration of one of the Attorney General’s own regulations, 21 CFR §1306.04 (2005), which requires all prescriptions be issued “for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.” As such, the Government says, the Interpretive Rule is entitled to considerable deference in accordance with Auer.
In our view Auer and the standard of deference it accords to an agency are inapplicable here. Auer involved a disputed interpretation of the Fair Labor Standards Act of 1938 as applied to a class of law enforcement officers. Under regulations promulgated by the Secretary of Labor, an exemption from overtime pay depended, in part, on whether the employees met the “salary basis” test. 519 U. S., at 454-455. In this Court the Secretary of Labor filed an amicus brief explaining why, in his view, the regulations gave exempt status to the officers. Id., at 461. We gave weight to that interpretation, holding that because the applicable test was “a creature of the Secretary’s own regulations, his interpretation of it is, under our jurisprudence, controlling unless plainly erroneous or inconsistent with the regulation.” Ibid, (internal quotation marks omitted).
In Auer, the underlying regulations gave specificity to a statutory scheme the Secretary of Labor was charged with enforcing and reflected the considerable experience and expertise the Department of Labor had acquired over time with respect to the complexities of the Fair Labor Standards *257 Act. Here, on the other hand, the underlying regulation does little more than restate the terms of the statute itself. The language the Interpretive Rule addresses comes from Congress, not the Attorney General, and the near equivalence of the statute and regulation belies the Government’s argument for Auer deference.
The Government does not suggest that its interpretation turns on any difference between the statutory and regulatory language. The CSA allows prescription of drugs only if they have a “currently accepted medical use,” 21 U. S. C. § 812(b); requires a “medical purpose” for dispensing the least controlled substances of those on the schedules, § 829(c); and, in its reporting provision, defines a “valid prescription” as one “issued for a legitimate medical purpose,” §830(b)(3)(A)(ii). . Similarly, physicians are considered to be acting as practitioners under the statute if they dispense controlled substances “in the course of professional practice.” §802(21). The regulation uses the terms “legitimate medical purpose” and “the course of professional practice,” ibid., but this just repeats two statutory phrases and attempts to summarize the others. It gives little or no instruction on a central issue in this case: Who decides whether a particular activity is in “the course of professional practice” or done for a “legitimate medical purpose”? Since the regulation gives no indication how to decide this issue, the Attorney General’s effort to decide it now cannot be considered an interpretation of the regulation. Simply put, the existence of a parroting regulation does not change the fact that the question here is not the meaning of the regulation but the meaning of the statute. An agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language.
Furthermore, as explained below, if there is statutory authority to issue the Interpretive Rule it comes from the 1984 amendments to the CSA that gave the Attorney General au *258 thority to register and deregister physicians based on the public interest. The regulation was enacted before those amendments, so the Interpretive Rule cannot be justified as indicative of some intent the Attorney General had in 1971. That the current interpretation runs counter to the “intent at the time of the regulation’s promulgation” is an additional reason why Auer deference is unwarranted. Thomas Jefferson Univ. v. Shalala, 512 U. S. 504, 512 (1994) (internal quotation marks omitted). Deference under Auer being inappropriate, we turn to the question whether the Interpretive Rule, on its own terms, is a permissible interpretation of the CSA.
B
Just as the Interpretive Rule receives no deference under. Auer, neither does it receive deference under Chevron. If a statute is ambiguous, judicial review of administrative rulemaking often demands Chevron deference; and the rule is judged accordingly. All would agree, we should think, that the statutory phrase “legitimate medical purpose” is a generality, susceptible to more precise definition and open to varying constructions, and thus ambiguous in the relevant sense. Chevron deference, however, is not accorded merely because the statute is ambiguous and an administrative official is involved. To begin with, the rule must be promulgated pursuant to authority Congress has delegated to the official. Mead, supra, at 226-227.
The Attorney General has rulemaking power to fulfill his duties under the CSA. The specific respects in which he is authorized to make rules, however, instruct us that he is not authorized to make a rule declaring illegitimate a medical standard for care and treatment of patients that is specifically authorized under state law.
'Die starting point for this inquiry is, of course, the language of the delegation provision itself. In many cases authority is clear because the statute gives an agency broad power to enforce all provisions of the statute. See, e. g., Na *259 tional Cable & Telecommunications Assn. v. Brand X Internet Services, 545 U. S. 967, 980 (2005) (explaining that a Federal Communications Commission regulation received Chevron deference because “Congress has delegated to the Commission the authority to . . . ‘prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions’ of the Act” (quoting 47 U. S. C. § 201(b))); Household Credit Services, Inc. v. Pfennig, 541 U. S. 232, 238 (2004) (giving Chevron deference to a Federal Reserve Board regulation where “Congress has expressly delegated to the Board the authority to prescribe regulations ... as, in the judgment of the Board, ‘are necessary or proper to effectuate the purposes of’” the statute (quoting 15 U. S. C. § 1604(a))). The CSA does not grant the Attorney General this broad authority to promulgate rules.
The CSA gives the Attorney General limited powers, to be exercised in specific ways. His rulemaking authority under the CSA is described in two provisions: (1) “The Attorney General is authorized to promulgate rules and regulations and to charge reasonable fees relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances and to listed chemicals,” 21 U. S. C. §821 (2000 ed., Supp. V); and (2) “The Attorney General may promulgate and enforce any rules, regulations, and procedures which he may deem necessary and appropriate for the efficient execution of his functions under this subchapter,” 21 U. S. C. § 871(b). As is evident from these sections, Congress did not delegate to the Attorney General authority to carry out or effect all provisions of the CSA. Rather, he can promulgate rules relating only to “registration” and “control,” and “for the efficient execution of his functions” under the statute.
Turning first to the Attorney General’s authority to make regulations for the “control” of drugs, this delegation cannot sustain the Interpretive Rule’s attempt to define standards of medical practice. Control is a term of art in the CSA. *260 “As used in this subchapter,” §802 — the subchapter that includes §821—
“The term ‘control’ means to add a drug or other substance, or immediate precursor, to a schedule under part B of this subchapter, whether by transfer from another schedule or otherwise.” §802(5).
To exercise his scheduling power, the Attorney General must follow a detailed set of procedures, including requesting a scientific and medical evaluation from the Secretary. See 21 U. S. C. §§811, 812 (2000 ed. and Supp. V). The statute is also specific as to the manner in which the Attorney General must exercise this authority: “Rules of the Attorney General under this subsection [regarding scheduling] shall be made on the record after opportunity for a hearing pursuant to the rulemaking procedures prescribed by [the Administrative Procedure Act, 5 U. S. C. § 553].” 21 U. S. C. § 811(a). The Interpretive Rule now under consideration does not concern the scheduling of substances and was not issued after the required procedures for rules regarding scheduling, so it cannot fall under the Attorney General’s “control” authority.
Even if “control” in §821 were understood to signify something other than its statutory definition, it would not support the Interpretive Rule. The statutory references to “control” outside the scheduling context make clear that the Attorney General can establish controls “against diversion,” e. g., § 828(a)(1), but do not give him authority to define diversion based on his view of legitimate medical practice. As explained below, the CSA’s express limitations on the Attorney General’s authority, and other indications from the statutory scheme, belie any notion that the Attorney General has been granted this implicit authority. Indeed, if “control” were given the expansive meaning required to sustain the Interpretive Rule, it would transform the carefully described *261 limits on the Attorney General’s authority over registration and scheduling into mere suggestions.
We turn, next, to the registration provisions of the CSA. Before 1984, the Attorney General was required to register any physician who was authorized by his State. The Attorney General could only deregister a physician who falsified his application, was convicted of a felony relating to controlled substances, or had his state license or registration revoked. See 84 Stat. 1255. The CSA was amended in 1984 to allow the Attorney General to deny registration to an applicant “if he determines that the issuance of such registration would be inconsistent with the public interest.” 21 U. S. C. § 823(f). Registration may also be revoked or suspended by the Attorney General on the same grounds. § 824(a)(4). In determining consistency with the public interest, the Attorney General must, as discussed above, consider five factors, including: the State’s recommendation; compliance with state, federal, and local laws regarding controlled substances; and public health and safety. § 823(f).
The Interpretive Rule cannot be justified under this part of the statute. It does not undertake the five-factor analysis and concerns much more than registration. Nor does the Interpretive Rule on its face purport to be an application of the registration provision in § 823(f). It is, instead, an interpretation of the substantive federal law requirements (under 21 CFR § 1306.04 (2005)) for a valid prescription. It begins by announcing that assisting suicide is not a “legitimate medical purpose” under § 1306.04, and that dispensing controlled substances to assist a suicide violates the CSA. 66 Fed. Reg. 56608. Violation is a criminal offense, and often a felony, under 21 U. S. C. §841 (2000 ed. and Supp. II). The Interpretive Rule thus purports to declare that using controlled substances for physician-assisted suicide is a crime, an authority that goes well beyond the Attorney General’s statutory power to register or deregister.
*262 The Attorney General’s deregistration power, of course, may carry implications for criminal enforcement because if a physician dispenses a controlled substance after he is dereg-istered, he violates §841. The Interpretive Rule works in the opposite direction, however: It declares certain conduct criminal, placing in jeopardy the registration of any physician who engages in that conduct. To the extent the Interpretive Rule concerns registration, it simply states the obvious because one of the five factors the Attorney General must consider in deciding the “public interest” is “[cjompliance with applicable State, Federal, or local laws relating to controlled substances.” 21 U. S. C. § 823(f)(4). The problem with the design of the Interpretive Rule is that it cannot, and does not, explain why the Attorney General has the authority to decide what constitutes an underlying violation of the CSA in the first place. The explanation the Government seems to advance is that the Attorney General’s authority to decide whether a physician’s actions are inconsistent with the “public interest” provides the basis for the Interpretive Rule.
By this logic, however, the Attorney General claims extraordinary authority. If the Attorney General’s argument were correct, his power to deregister necessarily would include the greater power to criminalize even the actions of registered physicians, whenever they engage in conduct he deems illegitimate. This power to criminalize — unlike his power over registration, which must be exercised only after considering five express statutory factors — would be unrestrained. It would be anomalous for Congress to have so painstakingly described the Attorney General’s limited authority to deregister a single physician or schedule a single drug, but to have given him, just by implication, authority to declare an entire class of activity outside “the course of professional practice,” and therefore a criminal violation of the CSA. See Federal Maritime Comm’n v. Seatrain Lines, Inc., 411 U. S. 726, 744 (1973) (“In light of these specific *263 grants of . . . authority, we are unwilling to construe the ambiguous provisions ... to serve this purpose [of creating further authority] — a purpose for which it obviously was not intended”).
Sutton v. United Air Lines, Inc., 527 U. S. 471 (1999), is instructive. The statute at issue was the Americans with Disabilities Act of 1990 (ADA), which, like the CSA, divides interpretive authority among various executive actors. The Court relied on “the terms and structure of the ADA” to decide that neither the Equal Employment Opportunity Commission (EEOC), nor any other agency, had authority to define “disability” in the ADA. Id., at 479. Specifically, the delegating provision stated that the EEOC “shall issue regulations ... to carry out this subchapter,” 42 U. S. C. § 12116, and the section of the statute defining “disability” was in a different subchapter. The Court did not accept the idea that because “the employment subchapter, i. e., ‘this subchapter,’ includes other provisions that use the defined terms,... [t]he EEOC might elaborate, through regulations, on the meaning of ‘disability’... if elaboration is needed in order to ‘carry out’ the substantive provisions of ‘this sub-chapter.’” 527 U. S., at 514 (Breyer, J., dissenting). See also Adams Fruit Co. v. Barrett, 494 U. S. 638, 649-650 (1990) (holding that a delegation of authority to promulgate motor vehicle safety “standards” did not include the authority to decide the pre-emptive scope of the federal statute because “[n]o such delegation regarding [the statute’s] enforcement provisions is evident in the statute”).
The same principle controls here. It is not enough that the terms “public interest,” “public health and safety,” and “Federal law” are used in the part of the statute over which the Attorney General has authority. The statutory terms “public interest” and “public health” do not call on the Attorney General, or any other executive official, to make an independent assessment of the meaning-of federal law. The Attorney General did not base the Interpretive Rule on an *264 application of the five-factor test generally, or the “public health and safety” factor, specifically. Even if he had, it is doubtful the Attorney General could cite the “public interest” or “public health” to deregister a physician simply because he deemed a controversial practice permitted by state law to have an illegitimate medical purpose.
As for the federal-law factor, though it does require the Attorney General to decide “Compliance” with the law, it does not suggest that he may decide what the law says. Were it otherwise, the Attorney General could authoritatively interpret “State” and “local laws,” which are also included in 21 U. S. C. § 823(f), despite the obvious constitutional problems in his doing so. Just as he must evaluate compliance with federal law in deciding about registration, the Attorney General must as surely evaluate compliance with federal law in deciding whether to prosecute; but this does not entitle him to Chevron deference. See Crandon v. United States, 494 U. S. 152, 177 (1990) (Scalia, J., concurring in judgment) (“The Justice Department, of course, has a very specific responsibility to determine for itself what this statute means, in order to decide when to prosecute; but we have never thought that the interpretation of those charged with prosecuting criminal statutes is entitled to deference”).
The limits on the Attorney General’s authority to define medical standards for the care and treatment of patients bear also on the proper interpretation of § 871(b). This section allows the Attorney General to best determine how to execute “his functions.” It is quite a different matter, however, to say that the Attorney General can define the substantive standards of medical practice as part of his authority. To find a delegation of this extent in §871 would put that part of the statute in considerable tension with the narrowly defined delegation concerning control and registration. It would go, moreover, against the plain language of the text to treat a delegation for the “execution” of his functions as a further delegation to define other functions well beyond *265 the statute’s specific grants of authority. When Congress chooses to delegate a power of this extent, it does so not by referring back to the administrator’s functions but by giving authority over the provisions of the statute he is to interpret. See, e. g., National Cable & Telecommunications Assn., 545 U. S. 967; Household Credit Services, 541 U. S. 232.
The authority desired by the Government is inconsistent with the design of the statute in other fundamental respects. The Attorney General does not have the sole delegated authority under the CSA. He must instead share it with, and. in some respects defer to, the Secretary, whose functions are likewise delineated and confined by the statute. The CSA allocates decisionmaking powers among statutory actors so that medical judgments, if they are to be decided at the federal level and for the limited objects of the statute, are placed in the hands of the Secretary. In the scheduling context, for example, the Secretary’s recommendations on scientific and medical matters bind the Attorney General. The Attorney General cannot control a substance if the Secretary disagrees. 21 U. S. C. § 811(b). See H. R. Rep. No. 91-1444, pt. 1, p. 33 (1970) (the section “is not intended to authorize the Attorney General to undertake or support medical and scientific research [for the purpose of scheduling], which is within the competence of the Department of Health, Education, and Welfare”).
In a similar vein the 1970 Act’s regulation of medical practice with respect to drug rehabilitation gives the Attorney General a limited role; for it is the Secretary who, after consultation with the Attorney General and national medical groups, “determine[s] the appropriate methods of professional practice in the medical treatment of... narcotic addiction.” 42 U. S. C. § 290bb-2a; see 21 U. S. C. § 823(g) (2000 ed. and Supp. II) (stating that the Attorney General shall register practitioners who dispense drugs for narcotics treatment when the Secretary has determined the applicant is qualified to treat addicts and the Attorney General has con- *266 eluded the applicant will comply with recordkeeping and security regulations); Moore, 423 U. S., at 144 (noting that in enacting the addiction-treatment provisions, Congress sought to change the fact “that ‘criminal prosecutions’ in the past had turned on the opinions of federal prosecutors”); H. R. Rep. No. 93-884, p. 6 (1974) (“This section preserves the distinctions found in the [CSA] between the functions of the Attorney General and the Secretary .... All decisions of a medical nature are to be made by the Secretary .... Law enforcement decisions respecting the security of stocks of narcotic drugs and the maintenance of records on such drugs are to be made by the Attorney General”).
Postenactment congressional commentary on the CSA’s regulation of medical practice is also at odds with the Attorney General’s claimed authority to determine appropriate medical standards. In 1978, in preparation for ratification of the Convention on Psychotropic Substances, Feb. 21,1971, [1979-1980] 32 U. S. T. 543, T. I. A. S. No. 9725, Congress decided it would implement the United States’ compliance through “the framework of the procedures and criteria for classification of substances provided in the” CSA. 21 U. S. C. §801a(3). It did so to ensure that “nothing in the Convention will interfere with ethical medical practice in this country as determined by [the Secretary] on the basis of a consensus of the views of the American medical and scientific community.” Ibid.
The structure of the CSA, then, conveys unwillingness to cede medical judgments to an executive official who lacks medical expertise. In interpreting statutes that divide authority, the Court has recognized: “Because historical familiarity and policymaking expertise account in the first instance for the presumption that Congress delegates interpretive lawmaking power to the agency rather than to the reviewing court, we presume here that Congress intended to invest interpretive power in the administrative actor in the best position to develop these attributes.” Mar *267 tin v. Occupational Safety and Health Review Comm’n, 499 U. S. 144, 153 (1991) (citations omitted). This presumption works against a conclusion that the Attorney General has authority to make quintessentially medical judgments.
The Government contends the Attorney General's decision here is a legal, not a medical, one. This generality, however, does not suffice. The Attorney General’s Interpretive Rule, and the Office of Legal Counsel memo it incorporates, place extensive reliance on medical judgments and the views of the medical community in concluding that assisted suicide is not a “legitimate medical purpose.” See 66 Fed. Reg. 56608 (noting the “medical” distinctions between assisting suicide and giving sufficient medication to alleviate pain); Memorandum from Office of Legal Counsel to Attorney General (June 27,2001), App. to Pet. for Cert. 121a-122a, and n. 17 (discussing the “Federal medical policy” against physician-assisted suicide), id., at 124a-130a (examining views of the medical community). This confirms that the authority claimed by the Attorney General is both beyond his expertise and incongruous with the statutory purposes and design.
The idea that Congress gave the Attorney General such broad and unusual authority through an implicit delegation in the CSA’s registration provision is not sustainable. “Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not, one might say, hide elephants in mouse-holes.” Whitman v. American Trucking Assns., Inc., 531 U. S. 457, 468 (2001); see FDA v. Brown & Williamson Tobacco Corp., 529 U. S. 120, 160 (2000) (“[W]e are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion”).
The importance of the issue of physician-assisted suicide, which has been the subject of an “earnest and profound debate” across the country, Glucksberg, 521 U. S., at 735, makes the oblique form of the claimed delegation all the more sus *268 pect. Under the Government’s theory, moreover, the medical judgments the Attorney General could make are not limited to physician-assisted suicide: Were this argument accepted, he could decide whether any particular drug may be used for any particular purpose, or indeed whether a physician who administers any controversial treatment could be deregistered. This would occur, under the Government’s view, despite the statute’s express limitation of the Attorney General’s authority to registration and control, with attendant restrictions on each of those functions, and despite the statutory purposes to combat drug abuse and prevent illicit drug trafficking.
We need not decide whether Chevron deference would be warranted for an interpretation issued by the Attorney General concerning matters closer to his role under the CSA, namely, preventing doctors from engaging in illicit drug trafficking. In light of the foregoing, however, the CSA does not give the Attorney General authority to issue the Interpretive Rule as a statement with the force of law.
If, in the course of exercising his authority, the Attorney General uses his analysis in the Interpretive Rule only for guidance in deciding when to prosecute or deregister, then the question remains whether his substantive interpretation is correct. Since the Interpretive Rule was not promulgated pursuant to the Attorney General’s authority, its interpretation of “legitimate medical purpose” does not receive Chevron deference. Instead, it receives deference only in accordance with Skidmore. “The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.” 323 U. S., at 140; see also Mead, 533 U. S., at 235 (noting that an opinion receiving Skidmore deference may “claim the merit of its writer’s thoroughness, logic, and expertness, its fit with prior interpretations, and any other *269 sources of weight”). The deference here is tempered by the Attorney General’s lack of expertise in this area and the apparent absence of any consultation with anyone outside the Department of Justice who might aid in a reasoned judgment. In any event, under Skidmore, we follow an agency’s rule only to the extent it is persuasive, see Christensen v. Harris County, 529 U. S. 576, 587 (2000); and for the reasons given and for further reasons set out below, we do not find the Attorney General’s opinion persuasive.
As we have noted before, the CSA “repealed most of the earlier antidrug laws in favor of a comprehensive regime to combat the international and interstate traffic in illicit drugs.” Raich, 545 U. S., at 12. In doing so, Congress sought to “conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances.” Ibid. It comes as little surprise, then, that we have not considered the extent to which the CSA regulates medical practice beyond prohibiting a doctor from acting as a drug “ ‘pusher’ ” instead of a physician. Moore, 423 U. S., at 143. In Moore, we addressed a situation in which a doctor “sold drugs, not for legitimate purposes, but primarily for the profits to be derived therefrom.” Id., at 135 (quoting H. R. Rep. No. 91-1444, pt. 1, at 10; internal quotation marks omitted). There the defendant, who had engaged in large-scale over-prescribing of methadone, “concede[d] in his brief that he did not observe generally accepted medical practices.” 423 U. S., at 126. And in United States v. Oakland Cannabis Buyers’ Cooperative, 532 U. S. 483 (2001), Congress’ express determination that marijuana had no accepted medical use foreclosed any argument about statutory coverage of drugs available by a doctor’s prescription.
In deciding whether the CSA can be read as prohibiting physician-assisted suicide, we look to the statute’s text and design. The statute and our case law amply support the *270 conclusion that Congress regulates medical practice insofar as it bars doctors from using their prescription-writing powers as a means to engage in illicit drug dealing and trafficking as conventionally understood. Beyond this, however, the statute manifests no intent to regulate the practice of medicine generally. The silence is understandable given the structure and limitations of federalism, which allow the States “ ‘great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.’ ” Medtronic, Inc. v. Lohr, 518 U. S. 470, 475 (1996) (quoting Metropolitan Life Ins. Co. v. Massachusetts, 471 U. S. 724, 756 (1985)).
The structure and operation of the CSA presume and rely upon a functioning medical profession regulated under the States’ police powers. The Attorney General can register a physician to dispense controlled substances “if the applicant is authorized to dispense ... controlled substances under the laws of the State in which he practices.” 21 U. S. C. § 823(f). When considering whether to revoke a physician’s registration, the Attorney General looks not just to violations of federal drug laws; but he “shall” also consider “[t]he recommendation of the appropriate State licensing board or professional disciplinary authority” and the registrant’s compliance with state and local drug laws. Ibid. The very definition of a “practitioner” eligible to prescribe includes physicians “licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which he practices” to dispense controlled substances. § 802(21). Further cautioning-against the conclusion that the CSA effectively displaces the States’ general regulation of medical practice is the Act’s pre-emption provision, which indicates that, absent a positive conflict, none of the Act’s provisions should be “construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates ... to the exclusion of any State law on the same subject mat *271 ter which would otherwise be within the authority of the State.” §903.
Oregon’s regime is an example of the state regulation of medical practice that the CSA presupposes. Rather than simply decriminalizing assisted suicide, ODWDA limits its exercise to the attending physicians of terminally ill patients, physicians who must be licensed by Oregon’s Board of Medical Examiners. Ore. Rev. Stat. §§127.815, 127.800(10) (2003). The statute gives attending physicians a central role, requiring them to provide prognoses and prescriptions, give information about palliative alternatives and counseling, and ensure patients are competent and acting voluntarily. § 127.815. Any eligible patient must also get a second opinion from another registered physician, § 127.820, and the statute’s safeguards require physicians to keep and submit to inspection detailed records of their actions, §§127.855, 127.865.
Even though regulation of health and safety is “primarily, and historically, a matter of local concern,” Hillsborough County v. Automated Medical Laboratories, Inc., 471 U. S. 707, 719 (1985), there is no question that the Federal Government can set uniform national standards in these areas. See Raich, supra, at 9. In connection to the CSA, however, we find only one area in which Congress set general, uniform standards of medical practice. Title I of the Comprehensive Drug Abuse Prevention and Control Act of 1970, of which the CSA was Title II, provides:
“[The Secretary], after consultation with the Attorney General and with national organizations representative of persons with knowledge and experience in the treatment of narcotic addicts, shall determine the appropriate methods of professional practice in the medical treatment of the narcotic addiction of various classes of narcotic addicts, and shall, report thereon from time to time to the Congress.” §4, 84 Stat. 1241, codified at 42 U. S. C. §290bb-2a.
*272 This provision strengthens the understanding of the CSA as a statute combating recreational drug abuse, and also indicates that when Congress wants to regulate medical practice in the given scheme, it does so by explicit language in the statute.
In the face of the CSA’s silence on the practice of medicine generally and its recognition of state regulation of the medical profession it is difficult to defend the Attorney General’s declaration that the statute impliedly criminalizes physician-assisted suicide. This difficulty is compounded by the CSA’s consistent delegation of medical judgments to the Secretary and its otherwise careful allocation of powers for enforcing the limited objects of the CSA. See Part II-B, supra. The Government’s attempt to meet this challenge rests, for the most part, on the CSA’s requirement that every Schedule II drug be dispensed pursuant to a “written prescription of a practitioner.” 21 U. S. C. § 829(a). A prescription, the Government argues, necessarily implies that the substance is being made available to a patient for a legitimate medical purpose. The statute, in this view, requires an anterior judgment about the term “medical” or “medicine.” The Government contends ordinary usage of these words ineluctably refers to a healing or curative art, which by these terms cannot embrace the intentional hastening of a patient’s death. It also points to the teachings of Hippocrates, the positions of prominent medical organizations, the Federal Government, and the judgment of the 49 States that have not legalized physician-assisted suicide as further support for the proposition that the practice is not legitimate medicine. See Brief for Petitioners 22-24; Memorandum from Office of Legal Counsel to Attorney General, App. to Pet. for Cert. 124a-130a.
On its own, this understanding of medicine’s boundaries is at least reasonable. The primary problem with the Government’s argument, however, is its assumption that the CSA *273 impliedly authorizes an executive officer to bar a use simply because it may be inconsistent with one reasonable understanding of medical practice. Viewed alone, the prescription requirement may support such an understanding, but statutes “should not be read as a series of unrelated and isolated provisions.” Gustafson v. Alloyd Co., 513 U. S. 561, 570 (1995). The CSA’s substantive provisions and their arrangement undermine this assertion of an expansive federal authority to regulate medicine.
The statutory criteria for deciding what substances are controlled, determinations which are central to the Act, consistently connect the undefined term “drug abuse” with addiction or abnormal effects on the nervous system. When the Attorney General schedules drugs, he must consider a substance’s psychic or physiological dependence liability. 21 U. S. C. § 811(e)(7). To classify a substance in Schedules II through V, the Attorney General must find abuse of the drug leads to psychological or physical dependence. § 812(b). Indeed, the differentiation of Schedules II through V turns in large part on a substance’s habit-forming potential: The more addictive a substance, the stricter the controls. Ibid. When Congress wanted to extend the CSA’s regulation to substances not obviously habit forming or psychotropic, moreover, it relied not on executive ingenuity, but rather on specific legislation. See § 1902(a) of the Anabolic Steroids Control Act of 1990,104 Stat. 4851 (placing anabolic steroids in Schedule III).
The statutory scheme with which the CSA is intertwined further confirms a more limited understanding of the prescription requirement. When the Secretary considers Food and Drug Administration approval of a substance with “stimulant, depressant, or hallucinogenic effect,” he must forward the information to the Attorney General for possible scheduling. Shedding light on Congress’ understanding of drug abuse, this requirement appears under the heading “Abuse *274 potential.” 21 U. S. C. § 811(f). Similarly, when Congress prepared to implement the Convention on Psychotropic Substances, it did so through the CSA. § 801a.
The Interpretive Rule rests on a reading of the prescription requirement that is persuasive only to the extent one scrutinizes the provision without the illumination of the rest of the statute. See Massachusetts v. Morash, 490 U. S. 107, 114-115 (1989). Viewed in its context, the prescription requirement is better understood as a provision that ensures patients use controlled substances under the supervision of a doctor so as to prevent addiction and recreational abuse. As a corollary, the provision also bars doctors from peddling to patients who crave the drugs for those prohibited uses. See Moore, 423 U. S., at 135, 143. To read prescriptions for assisted suicide as constituting “drug abuse” under the CSA is discordant with the phrase’s consistent use throughout the statute, not to mention its ordinary meaning.
The Government’s interpretation of the prescription requirement also fails under the objection that the Attorney General is an unlikely recipient of such broad authority, given the Secretary’s primacy in shaping medical policy under the CSA, and the statute’s otherwise careful allocation of decisionmaking powers. Just as the conventions of expression indicate that Congress is unlikely to alter a statute’s obvious scope and division of authority through muffled hints, the background principles of our federal system also belie the notion that Congress would use such an obscure grant of authority to regulate areas traditionally supervised by the States’ police power. It is unnecessary even to consider the application of clear statement requirements, see, e. g., United States v. Bass, 404 U. S. 336, 349 (1971); cf. BFP v. Resolution Trust Corporation, 511 U. S. 531, 544-546 (1994), or presumptions against pre-emption, see, e. g., Rush Prudential HMO, Inc. v. Moran, 536 U. S. 355, 387 (2002), to reach this commonsense conclusion. For all these reasons, we conclude the CSA’s prescription requirement does not au *275 thorize the Attorney General to bar dispensing controlled substances for assisted suicide in the face of a state medical regime permitting such conduct.
IV
The Government, in the end, maintains that the prescription requirement delegates to a single executive officer the power to effect a radical shift of authority from the States to the Federal Government to define general standards of medical practice in every locality. The text and structure of the CSA show that Congress did not have this far-reaching intent to alter the federal-state balance and the congressional role in maintaining it.
The judgment of the Court of Appeals is

Affirmed.