[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10804
Non-Argument Calendar

_____

D.C. Docket No. 3:08-cr-00027-LC-EMT-1; 3:13-cr-00095-LAC-EMT-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROBERT L. IGNASIAK, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(March 30, 2020)

Before MARTIN, JORDAN, and NEWSOM, Circuit Judges.

PER CURIAM:

Robert Ignasiak, Jr., proceeding pro se, challenges his convictions and 360-month prison sentence for healthcare fraud, dispensing controlled substances, and failure to appear for a jury trial.

**I.**

In 2008, a federal grand jury indicted Ignasiak on 54 counts related to the execution of a scheme to defraud Medicaid and Blue Cross Blue Shield of Florida. Several of these counts charged Ignasiak with unlawfully dispensing a variety of controlled substances. At trial, the government's theory of prosecution was that Ignasiak had prescribed unnecessary or excessive quantities of controlled substances without a legitimate medical purpose and "outside the usual course of professional practice." United States v. Ignasiak, 667 F.3d 1217, 1219 (11th Cir. 2012). Two of the counts further charged that "death resulted" from the use of controlled substances prescribed to two patients, M.B. and B.E. Id.

Dana Easterly, the widower of patient B.E., testified at trial that Ignasiak began treating his wife within a few months after they moved to Florida from Louisiana in 1999. Id. at 1223–24. B.E. had been in a tragic car accident in 1994, in which her nine-year old daughter was killed and B.E. was ejected through the windshield headfirst, causing serious injuries to her face. Id. at 1224. Before seeing Ignasiak, B.E. had several reconstructive surgeries and had a history of major depression, anxiety, seizures, peptic ulcers, and fainting spells. Id. B.E.'s

2

husband and son both testified that the prescriptions Ignasiak wrote B.E. for Lortab, Valium, Duragesic patches, and Xanax made her lethargic and nonfunctional.  Id.  On the day B.E. died, she "seemed fine," but when her husband returned home from work she was slumped over on the sofa bed and paramedics were not able to revive her.  Id.  B.E.'s autopsy determined that she died of "multiple drug intoxication."  Id.  The autopsy report did not reveal the levels of controlled substances in her system at the time of her death.  Id.  However, hospital records showed that the Xanax in B.E.'s system was in the therapeutic range but she had other drugs in her system that were slightly higher than the therapeutic range.  Id.  The autopsy was unable to rule out the possibility that B.E. died from a stroke she suffered three weeks prior to her death.  Id.

The government also presented the testimony of another medical examiner, who had conducted an autopsy of patient M.B.  Id. at 1225.  He testified that M.B. was a "woman who looked like she had been having a downhill path from a medical viewpoint, and was heading towards death."  Id. (alterations adopted). Ultimately, M.B.'s autopsy determined that M.B. died of complications from multiple drugs in her system, including toxic levels of diazepam and morphine.  Id. Leading up to M.B.'s death, Ignasiak had been prescribing her hydrocodone and diazepam on a monthly basis.  And during M.B.'s last office visit, at which she sought treatment for a broken toe, Ignasiak prescribed 50 morphine pills for her.

M.B. filled the morphine prescription on September 3, 2003, and died just days later.

After a nineteen-day trial, the jury found Ignasiak guilty of 43 of the 54 counts charged.  He was sentenced to a total term of 292-months imprisonment. Id. at 1219.

On January 19, 2012, this Court reversed and vacated Ignasiak's sentence and remanded to the district court for further proceedings.  Id. at 1231.  On April 19, 2012, this Court granted Ignasiak's motion for release from custody.  The district court scheduled a retrial for December 3, 2012, but sometime in November, Ignasiak faked death by suicide, absconded from pretrial supervision, and fled the state.  After he was captured in September 2013, Ignasiak ultimately pled guilty to several charges, but not to the two counts involving the deaths of B.E. and M.B. He was sentenced to a total term of 360 months.

Ignasiak did not appeal directly from that judgment, but instead filed a petition for habeas corpus alleging, among other things, that his counsel was ineffective for failing to file a direct appeal.  The district court agreed and vacated the earlier judgments.  It then imposed the same sentences so that Ignasiak could file an out-of-time appeal.

In this appeal, Ignasiak argues that the district court erred in accepting his guilty plea because it was unknowing and involuntary.  Second, Ignasiak argues

4

the district court erred in allowing his reprosecution.  Finally, Ignasiak argues that the district court erred in finding the drug weight for which he was responsible and incorrectly applied the Sentencing Guidelines in determining his sentencing range.

## II.

Ignasiak first claims his plea was not voluntary because it was "insincere" and ambivalent.  Where a defendant claims for the first time on appeal that the district court erred during his Rule 11 plea colloquy, we review for plain error. United States v. Monroe, 353 F.3d 1346, 1349 (11th Cir. 2003).  In order to determine whether a defendant's rights were substantially affected by a Rule 11 error, we have examined whether the overall plea colloquy adequately addresses the three "core concerns" of Rule 11.  Id. at 1354.  We examine whether (1) the plea was free from coercion; (2) the defendant understood the nature of the charges; and (3) the defendant was aware of the direct consequences of his guilty plea.  Id.  The defendant bears a heavy burden to show the district court erred during his plea colloquy.  United States v. Davila, 749 F.3d 982, 996 (11th Cir. 2014) (per curiam).

Ignasiak's assertion that his guilty plea was "insincere" is not enough to overcome this burden.  He must show more than that he "may be reluctant to tell the truth."  Davila, 749 F.3d at 996.

Second, Ignasiak implies that because the district court did not tell him about the impact Burrage v. United States, 571 U.S. 204, 134 S. Ct. 881 (2014), had on his plea agreement, his guilty plea was not knowing or voluntary.  Burrage changed the burden required under the CSA to show that the particular drugs distributed were the proximate cause of death.  See 571 U.S. at 216, 134 S. Ct. at 891 (holding but-for causation was required to support conviction under "death results" penalty enhancement provision).  Ignasiak claims the district court "expressly rejected" this causation definition, thereby misinforming Ignasiak "of the true nature of the charges against him."  If Ignasiak had known the true nature of the charges, he claims he would not have pled guilty.

However, Ignasiak pled guilty on January 14, 2014.  The Supreme Court issued its decision in Burrage on January 27, 2014, so the district court had no reason to inform Ignasiak of the Burrage decision.  Moreover, a guilty plea is not rendered involuntary by a subsequent change in the law.  See Brady v. United States, 397 U.S. 742, 757, 90 S. Ct. 1463, 1473 (1970).  The Supreme Court has expressly recognized that "the decision to plead guilty is [often] heavily influenced by the defendant's appraisal of the prosecution's case against him and by the apparent likelihood of securing leniency should a guilty plea be offered and accepted."  Id. at 756, 90 S. Ct. at 1473.  This is the case here.  Ignasiak noted that he pled guilty "in consideration for" the dismissal of the two counts related to

6

B.E.'s and M.B.'s deaths. But it is well-established that a defendant "is not entitled to withdraw his plea merely because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action." Id. at 757, 90 S. Ct. at 1473. The district court did not commit any error and Ignasiak's rights were not substantially affected by any purported failure to inform Ignasiak about the Supreme Court's decision in Burrage.

### III.

Although Ignasiak's knowing and voluntary guilty plea waives all non-jurisdictional defects in the proceedings, he may still challenge the indictment on jurisdictional grounds. United States v. Saac, 632 F.3d 1203, 1208 (11th Cir. 2011). In other words, "a guilty plea does not waive the right of an accused to challenge the constitutionality of the statute under which he is convicted." Id. (quotation marks omitted and alterations adopted).

Constitutional objections not raised before the district court are reviewed for plain error. United States v. Moriarty, 429 F.3d 1012, 1018 (11th Cir. 2005) (per curiam). A party may establish plain error by showing that: (1) there was an error; (2) the error was plain or obvious; (3) the error affected his substantial rights in that it was prejudicial and not harmless; and (4) the error seriously affected the fairness, integrity, or public reputation of the district court proceedings. United

States v. Olano, 507 U.S. 725, 732, 113 S. Ct. 1770, 1776 (1993).  Ignasiak

challenges his indictment on two grounds.

A. Neither the Tenth Amendment Nor the CSA Bar the Indictment.

Ignasiak argues that his actions comported with Florida's standards

governing the practice of medicine.  He says that both the Tenth Amendment and

Gonzales v. Oregon, 546 U.S. 243, 126 S. Ct. 904 (2006),[1] prevent the government

from enforcing the CSA because the regulation of the practice of medicine is a

right reserved to states, not the federal government.  Relatedly, Ignasiak argues that

his conviction violates the CSA because the CSA "forbids the Attorney General or

the courts from creating national standards for practicing medicine."

We have held that "Congress's valid exercise of authority delegated to it

under the Constitution does not violate the Tenth Amendment."  United States v.

Williams, 121 F.3d 615, 620 (11th Cir. 1997) (quotation marks omitted).  It is

firmly established that Congress has the "power to regulate purely local activities

---

[1] In Gonzales, the Supreme Court held that the CSA does not authorize the United States Attorney General to prohibit doctors from dispensing controlled substances for assisted suicide in the face of a state medical regime permitting such conduct and given the CSA's silence on the practice of medicine generally.  546 U.S. at 274–75, 126 S. Ct. at 925.  Gonzales involved an interpretive rule issued by the Attorney General that said a physician violates the CSA if he prescribes, dispenses, or administers controlled substances to assist suicide.  Gonzales, 546 U.S. at 254, 126 S. Ct. at 913–14.  That interpretive rule conflicted with an Oregon law that allowed physicians to dispense or prescribe a lethal dose of drugs at the request of a terminally ill patient. Id. at 249, 126 S. Ct. at 911.  The Supreme Court explained "there is no question that the Federal Government can set uniform national standards" of medical practice, id. at 271, 126 S. Ct. at 923, but the Court concluded that the CSA "manifests no intent to regulate the practice of medicine generally," id. at 270, 126 S. Ct. at 923.

8

that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." Gonzalez v. Raich, 545 U.S. 1, 17, 125 S. Ct. 2195, 2205 (2005). We have recognized that one such activity—local distribution and possession of controlled substances—has a substantial and direct effect upon interstate commerce. United States v. Collier, 478 F.2d 268, 272–73 (5th Cir. 1973).[2] And in that circumstance, we specifically rejected the argument that the Tenth Amendment invades a state's power to control medical practice. Id. We reject Ignasiak's Tenth Amendment argument for the same reasons.

Similarly, our precedent compels the conclusion that the CSA is a valid exercise of federal power. Raich, 545 U.S. at 9, 125 S. Ct. at 2201; United States v. Joseph, 709 F.3d 1082, 1094, 1103 (11th Cir. 2013) (distinguishing Gonzales v. Oregon because Gonzales did not determine whether the jury was required to find the defendants acted in accord with an accepted standard of professional practice). Under the CSA, except as authorized, it is unlawful for a person to knowingly or intentionally distribute or dispense a controlled substance. 21 U.S.C. § 841(a)(1). One authorized exception permits licensed doctors to dispense controlled substances with prescriptions. 21 U.S.C. § 829(a), (b). In prosecuting a doctor under § 841, the question is not whether a doctor's activities comported with a

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209.

single national standard of medical practice, but whether he "dispensed [or distributed] controlled substances for other than legitimate medical purposes in the usual course of professional practice, and that he did so knowingly and intentionally." Joseph, 709 F.3d at 1094, 1103; see 21 C.F.R. § 1306.04(a). The government was therefore required to "prove that the actions of the defendant[] were inconsistent with any accepted standard of professional practice." Joseph, 709 F.3d at 1095.

The government did just that. The indictment charged Ignasiak with prescribing large amounts of controlled substances outside the usual course of medical practice and for other than legitimate medical purposes. This language in the indictment tracks the CSA and does not suggest Ignasiak's conduct must be evaluated against a single national standard of medical practice. See Joseph, 709 F.3d at 1094, 1103.

The district court did not plainly err in allowing Ignasiak's prosecution under the CSA because Congress acted within its constitutional authority when enacting the CSA and, thus, his prosecution did not violate the Tenth Amendment.

B. Ignasiak's Reprosecution Does Not Violate the Double Jeopardy Clause.

Third, Ignasiak argues the government's second prosecution of him violates the Constitution's Double Jeopardy Clause. We review double jeopardy claims not raised before the district court for plain error. United States v. Bobb, 577 F.3d

10

1366, 1371 (11th Cir. 2009).  The Fifth Amendment's Double Jeopardy Clause guarantees against (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense.  Id.

However, the Double Jeopardy Clause is not an absolute bar to successive trials.  Generally, the Clause does not bar reprosecution of a defendant whose conviction is overturned on appeal.  Justices of Bos. Mun. Court v. Lydon, 466 U.S. 294, 308, 104 S. Ct. 1805, 1813 (1984).  Retrial is permitted after a conviction is reversed on appeal if the grounds on which the case was reversed are unrelated to the defendant's guilt or innocence.  Montana v. Hall, 481 U.S. 400, 402–03, 107 S. Ct. 1825, 1826 (1987) (per curiam); see also United States v. Adkinson, 135 F.3d 1363, 1379 n.46 (11th Cir. 1998) (noting convictions reversed for trial error are subject to retrial).  In the previous appeal, this Court overturned Ignasiak's conviction based on an evidentiary ruling that violated the Confrontation Clause.  Ignasiak, 667 F.3d at 1231.  That violation is not related to Ignasiak's guilt or innocence, so the government was not barred from reprosecution.

## IV.

Finally, Ignasiak challenges the calculation of his guideline sentence.  We review de novo the district court's application of the Sentencing Guidelines, United States v. Norris, 452 F.3d 1275, 1280 (11th Cir. 2006), but we review for

11

clear error the factual determination on the quantity of drugs used to establish a base offense level for sentencing, United States v. Simpson, 228 F.3d 1294, 1298 (11th Cir. 2000).  When a defendant objects to a factual finding that is used in calculating his guideline sentence, such as drug amount, the government bears the burden of establishing the disputed fact by a preponderance of the evidence. United States v. Rodriguez, 398 F.3d 1291, 1296 (11th Cir. 2005).

Ignasiak first argues that his Presentence Investigation Report's ("PSI") reference to the dismissed charges related to the deaths of B.E. and M.B. rendered his guideline range inaccurate because the information about the patients' deaths should not have been considered for purposes of increasing his sentence.  This argument is not supported by the record.  In calculating Ignasiak's base offense level, the PSI used the drug weight but did not mention or take into consideration the death-related charges in calculating the guideline range.  Those charges were mentioned only at the end of the PSI in the discussion of reasons for a possible departure.  The district court did not depart from the guidelines here, so the deaths did not increase Ignasiak's sentence.

Second, Ignasiak claims that the district court committed a procedural error in calculating his sentence by applying the wrong guideline methodology in determining his relevant conduct and selecting an offense level that was too high. He relies on the Sentencing Commission's amendment to U.S.S.G. § 1B1.3 (2015),

which altered the guideline methodology for determining "relevant conduct." He claims that amendment applies retroactively to his case and, as such, the district court failed to (1) conduct a "relevant conduct hearing" and (2) use methodology required by the Guidelines. He argues that, if the district court had properly considered his relevant conduct, the drug weight in the PSI would have been lower.

The base offense level for a drug distribution offense is calculated by determining the quantity of drugs attributable to a defendant. See U.S.S.G. § 2D1.1(a)(5) (2013). The Guidelines also provide that types and quantities of drugs not specified in the conviction are to be included, as relevant conduct, in determining the offense level if they were part of the same course of conduct, common scheme, or plan as the count of conviction. Id. § 1B1.3(a)(2), comment. (n. 3) (2013); id. § 2D1.1, comment. (n. 5) (2013). "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." Id. § 1B1.3, comment. (n. 9(A)) (2013). We broadly interpret the provisions of the relevant-conduct guideline. United States v. Behr, 93 F.3d 764, 765 (11th Cir. 1996) (per curiam). All of a defendant's relevant conduct, including acquitted conduct and conduct not mentioned in an indictment, may be considered at sentencing. United States v. Hamaker, 455 F.3d 1316, 1338 (11th Cir. 2006).

13

The PSI recommended that Ignasiak's base level be set at 36, pursuant to U.S.S.G. § 2D1.1 (2008)—the guideline level applying to 10,000 to 30,000 kilograms of marijuana—because Ignasiak prescribed 81,830 pills of hydrocodone and 44,792 pills of oxycodone, the total equivalent of 13,917.8 kilograms of marijuana. It also recommended that the base offense level be adjusted upward four levels for vulnerable victims (addicts), see § 3A1.1, two levels for abuse of a special skill (the practice of medicine), see § 3B1.3, and two levels for obstruction of justice (absconding and failing to appear for trial), see § 3C1.1. With a total offense level of 44 and a criminal history category of I, Ignasiak's resulting guideline range would be life imprisonment. Ignasiak filed written objections to this calculation of the drug amount and raised these objections again at sentencing. The district court found the PSI to be accurate and ordered Ignasiak to serve a total term of 360 months. On appeal, Ignasiak does not dispute the drug quantities, but instead claims that the district court did not adhere to the methodology required by the Guidelines and therefore did not perform the "proper relevant-conduct calculation" for the "drug-weight portion" of his sentence.

The district court did not clearly err in considering the totality of Ignasiak's conduct. Ignasiak pled guilty to his involvement in a scheme of prescribing drugs to patients who did not need them, for his own gain, while also defrauding healthcare companies. At sentencing he conceded that, under the CSA, courts

14

"must take into account . . . all controlled substances for which the defendant's relevant conduct may be attributable." The drugs Ignasiak prescribed were all part of an ongoing series of offenses charged in the indictment. Each offense involved nearly identical conduct. Because the prescriptions were part of the same course of conduct, the district court properly considered the drug weight of all the prescriptions even though only a portion of them were charged in the indictment. See U.S.S.G. § 1B1.3, comment. (n.3).

Neither did the district court err in calculating Ignasiak's sentence under the Guidelines. The majority of the drug weight for which Ignasiak was prosecuted came from oxycodone, which was based on fewer prescriptions and was charged only once in the indictment. However, the presence of oxycodone in the drug weight calculations does not necessarily render the estimates unreasonable. The record showed that Ignasiak had over 3,000 patients, 95% of whom were prescribed drugs beyond the usual course of professional practice. The total drug weight for which Ignasiak was prosecuted was based on the prescriptions from only 55 of his patients—roughly 2% of the total patients—and was equivalent to over 14,000 kilograms of marijuana. Ignasiak does not dispute that he prescribed the drugs considered at sentencing, and if the government had chosen to calculate the drug weight for any other patients not included in the indictment, the total drug weight would likely have been far higher.

15

Ignasiak's reliance on the amendment to U.S.S.G. § 1B1.3 (2015), is also unavailing.  The government correctly points out that the amendment changed only the provision dealing with "jointly undertaken criminal activity."  See United States v. Presendieu, 880 F.3d 1228, 1245 (11th Cir. 2018).  In his reply brief, Ignasiak argues that because nurses, patients, and patient support groups were involved in his offense, they shared responsibility and he should not have been held wholly responsible for his conduct.  But we do not address arguments made for the first time in a reply brief.  United States v. Levy, 379 F.3d 1241, 1244 (11th Cir. 2004) (per curiam).

Because the district court did not clearly err in determining the quantity of drugs for which Ignasiak was responsible and did not err in applying the Guidelines, we affirm Ignasiak's sentence.

**AFFIRMED.**

16